Kimberly S. Thomsen [KT-3226]
Walker G. Harman, Jr. [WH-8044]
THE HARMAN FIRM, PC
*Attorneys for Plaintiffs*
200 West 57th Street, Suite 900
New York, NY 10019
(212) 425-2600
kthomsen@theharmanfirm.com

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------- X

VERONICA ROBLEDO and
KARIN MARIA WIDMANN,

                 *Plaintiffs*,

           -against-

BOND No. 9 a/k/a
BOND No. 9 PARFUME LEASEHOLD, INC. a/k/a
No. 9 PARFUME LEASEHOLD, INC. a/k/a and incorporated as
BOND No. 9 FRAGRANCE INC., and,
LAURICE RAHME, Individually,

               *Defendants*.
-------------------------------------------------------------------------- X

**Index no.: 12 CV 6111**

**COMPLAINT**

**PLAINTIFFS HEREBY DEMAND A TRIAL BY JURY**

       Plaintiffs, Veronica Robledo (hereinafter "ROBLEDO") and Karin Maria Widmann (hereinafter "WIDMANN") by their attorneys, The Harman Firm, PC, as and for their complaint of race discrimination including hostile work environment and retaliation, allege as follows:

**NATURE OF ACTION, PARTIES, JURISDICTION AND VENUE**

      1.     Plaintiffs ROBLEDO seeks to recover damages from Defendants BOND No. 9 a/k/a BOND No. 9 PARFUME LEASEHOLD, INC. a/k/a No. 9 PARFUME LEASEHOLD, INC. a/k/a and d/b/a BOND No. 9 FRAGRANCE INC., and LAURICE RAHME, individually,

for illegal race discrimination, including hostile work environment, disparate treatment, and retaliation.

2.     At all times relevant hereto, Plaintiff ROBLEDO who is of Puerto Rican descent and considers herself "Spanish-Black," and was considered "Latina" by Defendant RAHME, was a resident of Bronx County, State of New York, and was employed as a retail sales associate and/or perfume specialist or "perfumista" by Defendants at their flagship store located at 9 Bond Street, New York, NY.   During her employment, Plaintiff ROBLEDO was subjected by Defendant RAHME, to discrimination and disparate treatment based solely on her race.

3.     Plaintiff ROBLEDO never disclosed her self-assessed identity of "Black" to Defendant RAHME because of the prejudice Plaintiff ROBLEDO saw from Defendant RAHME to other black people.

4.     At all times relevant hereto, Plaintiff WIDMANN is a Caucasian woman who worked as a Store Manager for Defendants.

5.     Plaintiff WIDMANN was hired by Defendant RAHME on or around July 5, 2011 and continued to work for Defendants until she was terminated in retaliation for complaining about Defendant RAHME's race discrimination in the treatment of Defendants' staff and clients.

6.     Upon information and belief, BOND No. 9 a/k/a BOND No. 9 PARFUME LEASEHOLD, INC. a/k/a No. 9 PARFUME LEASEHOLD, INC. a/k/a and d/b/a  BOND No. 9 FRAGRANCE INC. ("BOND No. 9," or the "Company"), a Defendant herein, at all times hereinafter mentioned, was and still is, a global organization that maintains stores throughout the United States, including but not limited to New York, and that is duly organized and existing under and by virtue of the laws of the State of New York, duly engaged in business in the State of New York, with its principal place of business and flagship store at 9 Bond Street, New York,

NY 10012.  BOND No. 9 is a privately owned company that sells high-end perfumes, was responsible for managing Plaintiffs, and was responsible for paying Plaintiffs' wages.

7.     Upon information and belief, Defendant RAHME owns, operates and controls the day-to-day operations and management of Defendant BOND No. 9.

8.     All Defendants separately defined in ¶¶ 6-7 are hereinafter referred to as "Defendants."

9.     Upon information and belief, at all times relevant hereto, RAHME, a Defendant herein, maintained her principal office at the same location as the flagship store at 9 Bond Street, New York, NY.

10.     Jurisdiction of this Court is proper under 28 U.S.C. § 1331(a) in that claims arise under federal law specifically Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*  The supplemental jurisdiction of the Court is invoked over the local law cause of action pursuant to 28 U.S.C. § 1367.

11.     Venue is properly laid in the Southern District of New York under U.S.C. § 1391(a)(2), in that a substantial part of the events or omissions giving rise to the claims occurred, or a substantial part of property that is the subject of the action is situated.

12.     Plaintiffs ROBLEDO and WIDMANN have both filed employment discrimination charges with the New York State Division of Human Rights, which charges have been withdrawn so that Plaintiffs may pursue their state civil rights claims as part of this federal action.

## FACTUAL BACKGROUND

13.     Plaintiffs were forced endure working conditions that included hostile attitudes toward people of color and were subsequently fired for objecting to Defendant and owner LAURICE RAHME's pattern of racism against customers at, and employees of, Defendant BOND No. 9.

14.     Plaintiff ROBLEDO was hired as a retail Sales Representative by Defendant RAHME to work selling Defendants' products at Creed in or around 2001 with starting pay of $18 per hour.

15.     In 2005, Plaintiff ROBLEDO, still working as a Sales Representative, was moved to Defendant BOND No. 9.

16.     In 2010, Plaintiff ROBLEDO was promoted to Store Manager at Defendant BOND No. 9, which increased the Plaintiff's pay to first $26 then later $30 per hour.

17.     Approximately eight (8) months after Plaintiff ROBLEDO's promotion, she voluntarily returned to work as a Sales Representative because of the complications of an autoimmune disease, *pemphigus vulgaris*, atop the stress of verbal abuse by Defendant RAHME.

18.     Plaintiff ROBLEDO's job as a retail sales associate and perfumista entailed assisting walk-in customers in an effort to sell high-end perfumes and fragrances, distributing product samples as part of Defendants' marketing efforts, answering customer's questions about the products, assisting in maintaining the orderly appearance and organization of the store, including display of products, and performing sales-related paperwork and computerized tasks.

19.     During her employment, Plaintiff ROBLEDO was under the direction, supervision and control of Defendant RAHME.

## HOSTILE WORK ENVIRONMENT

20.    During her employment with Defendants, ROBLEDO was subjected to discrimination, including a hostile work environment and disparate treatment because of her race.

21.    Plaintiff ROBLEDO was subjected to a hostile work environment daily, at all times of the day.  The discrimination she suffered was severe and pervasive, ongoing on a daily basis, and due solely to her race.

22.    For instance, Defendant RAHME frequently ordered ROBLEDO to leave the front sales area of the store and go to the back of the store to clean, organize and prepare the tea area, while simultaneously smiling at white employees, chatting with them, complimenting them on their appearance, and instructing them to stand by the door to greet customers as they walked in.  Defendant RAHME gave this instruction to Plaintiff because she wanted only white employees greeting customers at the front of the store.

23.    Defendant RAHME also harassed ROBLEDO and other sales staff when they were attempting to assist black customers.

24.    Defendant RAHME used the code term "we the need the light bulbs changed" to signal that black shoppers were in the store, and that the sales staff should call for the stock personnel working downstairs to come up to the main sales area and act as security guards and bouncers, in order to monitor the black customers, and encourage them to leave as quickly as possible.

25.    For example, RAHME used the code term "change the light bulbs" whenever any black shoppers were in the store, no matter how many times a specific black shopper may have

been in the store previously, no matter how much he or she had spent or were spending, and no matter how they were dressed or behaved.

26.     Additionally, whenever black shoppers exited the store, RAHME would immediately lock the front door, and instruct the sales staff, including ROBLEDO to make sure to keep the door closed and locked until the staff was certain that the black shoppers had gone away.

27.     On these occasions, RAHME also would frequently tell the sales staff, including ROBLEDO, that the black shoppers were "thieves" and had come to steal her merchandise.

28.     When sales staff, including the store manager Karin WIDMANN, would attempt to contradict RAHME and tell her that the specific black shoppers were legitimate, law-abiding customers, RAHME would simply reply "I know these kind of people, they steal, and I just want them out of my store."

29.     Plaintiff ROBLEDO often advised RAHME that black shoppers were some of the top customers at the flagship store.   RAHME would respond by accusing ROBLEDO of personally knowing these shoppers and would ask, "How do you know them?  What kind of business are you doing with them?"

30.     RAHME repeatedly told ROBLEDO that she wanted black shoppers "out of her store as quickly as possible."

31.     For example, in a specific incident that took place on January 11, 2012, two black male shoppers entered the store and ROBLEDO greeted them.  RAHME then shouted for store manager WIDMANN and directed her to call downstairs for a light bulb change, using her code term for black shoppers.

32.     RAHME then personally interfered in ROBLEDO's assisting these two customers by spraying them with a perfume scent that they did not like, and telling them that if they did not like the scent, the store did not have what they were looking for.

33.     RAHME then directed ROBLEDO to give these two black shoppers some free product samples and "let them go."

34.     During this incident, the stock room employees had come upstairs and had surrounded the two black shoppers.

35.     ROBLEDO was so distraught and embarrassed during the incident that her hands were trembling.

36.     As soon as these two black shoppers left the store, RAHME locked the door, gave ROBLEDO a sneer, and instructed ROBLEDO and the other sales staff to not open the door for a while.

37.     Plaintiff WIDMANN later informed Defendant RAHME that the black customers had made a purchase and asked Defendant RAHME why she behaved in such a hurtful way.

38.     Defendant RAHME responded rhetorically "…shows what a manager you are. Who do you think [the thieves are]?" and answered her own question, "Black people!"

39.     The following day, Defendant RAHME retaliated against Plaintiff WIDMANN by calling her "stupid" and yelling at her most of the day.

40.     On or about January 13, 2012, Defendant RAHME accused Plaintiff ROBLEDO of knowing and having a black customer, whom Defendant RAHME labeled a thief, and of having the customer as a recurring client.

41.     When Plaintiff WIDMANN replied, Defendant RAHME yelled at her until Plaintiff WIDMANN almost fainted.

42.     On or about February 7, 2012, ROBLEDO was servicing a black couple by showing them different perfumes, when RAHME came out of the bathroom, approached ROBLEDO and asked her whether she had called downstairs about the light bulbs.  ROBLEDO and store manager WIDMANN, who is white, advised RAHME that the light bulbs were fine. However, RAHME would not leave the sales floor area until after the black couple had left.

43.     Over time, RAHME began to shout at ROBLEDO by asking her "if she knew what she was doing."  In fact, ROBLEDO was the most experienced and successful sales person in the store.

44.     When RAHME would enter the sales area, she would greet the white store manager, Karin WIDMANN, as well as the other white staff but not address ROBLEDO. ROBLEDO would address RAHME however by saying "good morning, Laurice," but RAHME would not answer her.

45.     On one occasion, store manager Karin WIDMANN was assisting a black customer when RAHME shouted that she needed to see her.  RAHME then told WIDMANN, "Who is this woman?  Why did nobody call downstairs for the stock boys?"  WIDMANN replied that the shopper was attempting to buy perfumes and RAHME said, "Did you not hear what I said, call downstairs!"

46.     After this particular customer had left the store, RAHME yelled at WIDMANN "You know the rule, one of you must call and use the code, change the light bulbs."  RAHME then walked to the door and locked it from the inside.

47.     When WIDMANN attempted to speak to RAHME about the many black customers the store had and how the store was successful and exceeding sales goals, RAHME told WIDMANN, "What, are you stupid?  I hired you as a manager and you have to do what I

say and be loyal to me.  Can you complain about your salary?  So, shut up and go upstairs, and mind your business."

48.    Store Manager WIDMANN witnessed RAHME verbally abuse ROBLEDO every day.

49.    Store Manager WIDMANN witnessed RAHME blame ROBLEDO for errors made by white employees, who were not blamed for those errors.

50.    Store Manager WIDMANN told RAHME that ROBLEDO was the store's top selling associate, and that she was smart, honest, and acting in RAHME's own interests by increasing sales.  RAHME responded by calling WIDMANN "stupid," and stated that black shoppers were there to steal and were dangerous people.

51.    When Plaintiff WIDMANN interfered with the Defendants' pattern and culture of racism and bigotry, Defendant RAHME retaliated by yelling at her throughout the rest of the day and sent WIDMANN on tasks that failed to accomplish anything useful as revenge.

52.    Plaintiff WIDMANN pleaded to Defendant RAHME to "please stop discriminating against black people and not to punish [WIDMANN] when [WIDMANN] tried to reason with [RAHME]."

53.    Defendant RAHME "[verbally] abused [Plaintiff ROBLEDO] … because of the color of [ROBLEDO's] skin" and "abused [Plaintiff WIDMANN] [verbally] for trying to be fair."

54.    On or about February 21, 2012, Plaintiff WIDMANN filed a sworn complaint with the New York State Division of Human Rights ("NYSDHR") in which she describes Defendant RAHME "harassed [Plaintiff WIDMANN] for being fair toward all employees regardless of color of skin."

55.    At the many instances of Plaintiff WIDMANN attempting to reason with Defendant RAHME regarding Defendants' racism and bigotry, WIDMANN was yelled at, called "stupid" or disloyal to Defendants or simply waved away.

56.    On or about February 9, 2012, Defendant RAHME accused Plaintiff ROBLEDO of providing more discounts to customers than anyone in the history of the company.

57.    Plaintiff WIDMANN refuted Defendant RAHME with a computer printout, which detailed that some contemporaneous white employees had provided more frequent and/or larger discounts than Plaintiff ROBLEDO.

58.    Defendant RAHME refused to even acknowledge the confuting printout let alone read it.

## RETALIATION

59.     On or about February 16, 2012, RAHME falsely accused ROBLEDO and WIDMANN of stealing $25,000 in store products and terminated them.

60.     The real reason for their termination was to retaliate against them for protesting RAHME's treatment of black customers, as well as RAHME'S specific acts of race discrimination against ROBLEDO.

**FIRST CAUSE OF ACTION**
**Violation of 42 U.S.C. § 1981**
**(on Behalf of Minority Plaintiff ROBLEDO)**

61.     Plaintiff ROBLEDO repeats and realleges each and every allegation contained in paragraphs "1" through "60" with the same force and effect as if separately alleged and reiterated herein.

62.     Defendants' discrimination against Plaintiff ROBLEDO and the members of the class is in violation of the rights of Plaintiffs and the class afforded them by the Civil Rights Act 1866, 42 U.S.C. § 1981, as amended by the Civil Rights Act of 1991.

63.     By the conduct described above, Defendants intentionally deprived the above-named minority members of the class of the same rights as are enjoyed by white citizens to the creation, performance, enjoyment, and all benefits and privileges, of their contractual employment relationship with Defendants, in violation of 42 U.S.C. § 1981.

64.     As a result of Defendants' discrimination in violation of Section 1981, the minority Plaintiffs and members of the class have been denied employment opportunities providing substantial compensation and benefits, thereby entitling them to injunctive and equitable monetary relief; and have suffered anguish, humiliation, distress, inconvenience and loss of enjoyment of life because of Defendants' actions, thereby entitling them to compensatory damages.

65.     In its discriminatory actions as alleged above, Defendants acted with malice or reckless indifference to the rights of the above-named minority Plaintiffs and class members, thereby entitling them to an award of punitive damages.

66.     To remedy the violations of the rights of Plaintiffs and the class secured by § 1981, Plaintiffs request that the Court award them the relief prayed for below.

**SECOND CAUSE OF ACTION**
**New York City Human Rights Law § 8-101, *et seq*.**

67.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "60" with the same force and effect as if separately alleged and reiterated herein.

68.     Defendants subjected Plaintiffs to race discrimination, disparate treatment, hostile work environment, and retaliation in violation of the New York City Human Administrative Code §§ 8-101, *et seq*.

69.     As a result, Plaintiffs suffered damages for past and future earnings, other employment benefits, and emotional injuries in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
## Retaliation under New York City Administrative Code § 8-107(4)(a)

70.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "60" with the same force and effect as if separately alleged and reiterated herein.

71.     New York City Administrative Code § 8-107(4)(a) states, "It shall be an unlawful discriminatory practice for any person . . . because of the . . . race . . . of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof, or, directly or indirectly, to make any declaration . . . to the effect that any of the accommodations, advantages, facilities and privileges of any such place or provider shall be refused, withheld from or denied to any person on account of . . . race . . . or that the patronage or custom of any person belonging to, purporting to be, or perceived to be, of any particular race . . . is unwelcome, objectionable or not acceptable, desired or solicited."

72.     The New York City Administrative Code § 8-107(7) provides that, "it shall be an unlawful discriminatory practice for any person . . . to retaliate or discriminate in any manner against any person because such person has opposed any practice forbidden under this chapter."

73.     Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code § 8-107(7) by discriminating against Plaintiffs because of Plaintiff's opposition to the unlawful practices of Defendants.

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

     i)  On the First Cause of Action, actual damages to be determined at trial, but in no event less than $1,000,000;

     ii)  On the Second Cause of Action, actual damages to be determined at trial, but in no event less than $1,000,000;

     iii) On the Third Cause of Action, actual damages to be determined at trial, but in no event less than $1,000,000;

     iv) Punitive damages;

     v)  Attorneys' fees, disbursements and other costs; and

     vi) Such other and further relief which the Court deems just and proper.


Dated: New York, New York
       August 10, 2012


By:   _____

Kimberly S. Thomsen [KT-3226]
Walker G. Harman, Jr. [WH-8044]
THE HARMAN FIRM, PC
*Attorneys for Plaintiffs*
200 West 57th Street, Suite 900
New York, NY 10019
(212) 425-2600
kthomsen@theharmanfirm.com